# Washabaugh *versus* Oyster.

1. A person owning ground and water-power on which a grist and saw-mill were erected, conveyed to another a part of the ground which had no running water on it, with the privilege of conveying from the stream to the lot, in a race, water for one wheel, but providing that the grantee was not to build a merchant or grist-mill, saw-mill, or paper-mill on said lot, but to use the water for a boring and blade-mill or tilting-hammer, or oil or hemp-mill, the water to be used only for one wheel, providing however, that the mills of the grantor, or any other he shall think proper to build in lieu of the saw-mill, not to take more water than a flutter-wheel with fifteen feet head,' shall be first sufficiently supplied. In an action by the plaintiff, who claimed under the grantor, against one who claimed by title deduced from the grantee, it was *held*, that if the water used by the defendant in carrying on a chopping-mill and brewery was only that which was suffered to escape from the plaintiff's dam and could not be reclaimed, that plaintiff cannot recover damages for using the same.

2. Though the plaintiff, as owner of the grist-mill, may have no right of action for diverting and using the water, yet he may have the right to prevent the owner of the chopping-mill and brewery from carrying on that business if it rival or impair the value of the plaintiff's property. There is no rule or principle of public policy which compels the grantor who granted the use

[Washabaugh *v.* Oyster.]

of water-power at a designated place, for the purpose of a boring-mill or other specified purpose, to submit to its use by one claiming under the grantee, for the purpose of a chopping-mill and brewery, purposes differing from those specified in the grant. His most obvious remedy however would be on *the contract*, and not for a tort.

3. Where a question existed whether the water used by the defendant belonged to the owner of the grist or to the owner of a paper-mill, it was error for the Court to charge that if the defendant used the water for the purpose of chopping or grinding grain, then it was in prejudice of the plaintiff's right, and he was entitled to a verdict. Whether the water used by the defendant was drawn from the pool of the dam of the grist-mill, or from that of the paper-mill, was a question of fact, which should have been submitted to the jury. Besides, the *place* where the dam of the grist-mill was erected when the grantee of the lot aforesaid purchased, and when the owner of the paper-mill purchased, may be material, as a question may arise as to the right in the grantor or any one claiming under him to change its location after he had conveyed.

4. An agreement between one claiming from the grantor and one claiming under the grantee, by which the misapplication of the water for chopping and brewing purposes was admitted, and by which permission was given to the latter to continue the water for such purposes *for a limited time*, viz., for three years, was admissible in evidence against the defendant in a suit by one claiming through the grantor, against one who afterwards purchased the title existing in the person to whom the lease was made, the suit being brought on account of the use of the water for the purposes above indicated.

ERROR to the Common Pleas of *Franklin county*.

This was an action of trespass, brought to April Term, 1851, by Jacob Oyster *v.* Upton Washabaugh, to recover damages for diverting and using a portion of the waters of Falling Spring. On the 15th May, 1790, Benjamin Chambers owned the grist-mill, &c., now belonging to Oyster, and also the ground on which the brewery, &c., now owned by Washabaugh, was afterwards erected. A paper-mill also exists, which is now owned by Culbertson; but when it was erected did not appear in the case as brought up. On the 15th May, 1790, Benjamin Chambers conveyed to Peter Snyder the lot of ground now claimed by the defendant. The lot had no running water on it, nor any buildings. With the lot, Chambers conveyed to " Peter Snyder, his heirs and assigns, the liberty and privilege of conveying from his spring in a race, water to said lot for one wheel, after said Chambers' grist and merchant-mill that he now has, with all the water-wheels, his saw-mill, or any other mill said Chambers shall think proper to build in lieu of said saw-mill, provided it don't take more than a flutter-wheel with fifteen feet head, all the abovesaid works of said Chambers is to be first sufficiently supplied, and that said Snyder, his heirs and assigns, is not to build neither merchant, grist, saw, or paper-mill on said lot; but is for the use of a boring and blade-mill, or tilting-hammer, or oil or hemp-mill, but is only to use water for one wheel, to the best advantage, so as to use the least water that the seat will admit of; and said Snyder is to build no other mill, nor make no other use of the water than the mills mentioned."

Snyder built on the lot, and he afterwards sold the property to *David* Washabaugh, who, some time before the year 1824, began to use the water for the purpose *of chopping grain for a brewery.* The title of Benjamin Chambers became vested in *Thomas Chambers*, between whom and David Washabaugh an agreement was entered into on 6th November, 1824, in which the grant to Snyder was referred to; and reciting that whereas the said David has been using the waters of the Falling Spring for other purposes than those mentioned in the deed to Snyder; and that Chambers was unwilling that any acquiescence in this on his part should be considered as a waiver of his right, or operate to his prejudice, Chambers agreed that Washabaugh might continue to use the water for the chopping and grinding of his own grain, to the turning of carding and other machinery, and to a brewery, for the term of three years from that date; and so from year to year during the will and pleasure of said Thomas.

On 26th October, 1831, Chambers had a written notice served on Washabaugh to quit the use of the waters of Falling Spring for any other purpose than what was granted in the deed from Benjamin Chambers to Peter Snyder; and that the lease and privileges granted to him by T. Chambers were ended.

The title of Thomas Chambers to the mill property became afterwards vested in *Jacob Oyster*, the plaintiff in this suit.

David Washabaugh died, and the water-power and privileges before referred to being offered for sale, Jacob Oyster, on 21st December, 1850, had a written notice read on the property on the day the same was sold. It was read in the presence of Upton Washabaugh, who became the purchaser. The notice was to the effect that the water-power and privileges claimed did not belong to the estate of the deceased, but were an encroachment on the rights of Oyster, and that their use was forbidden. Upton Washabaugh used the premises as a brewery, and also to chop grain for the brewery. It was alleged, on his part, that this required but about the one-fourth of the water which the objects permitted in the deed to Snyder would require. It was contended that he had a right so to use it. It was also contended that if he had no right to use the water, that still he had not *injured* the plaintiff, because he neither diverted nor used water belonging to Oyster. Also, that the water used by the defendant *escaped* from the plaintiff; not in consequence of the plaintiff's using it, but in consequence of the situation of the stream, and the condition of the plaintiff's race and dam. Also, that *damage* must be shown by plaintiff in order to sustain the action.

On the trial, the agreement between Thomas Chambers and David Washabaugh, of 6th November, 1824, was given in evidence on the part of *plaintiff*. On the part of the defendant points were proposed as follows:

[Washabaugh *v.* Oyster.]

1. That the defendant having a right by grant to use water sufficient to drive a tilt-hammer, oil-mill, boring and blade-mill, or hemp-mill, he can make a change in the mode and objects of its use, if the quantity used is not increased by such change, and the change is not to the prejudice of the plaintiff.

2. That, if the jury believes that the defendant uses only the water that escapes from the dam of the plaintiff, and which would not flow back into said dam, the plaintiff cannot recover in this action.

3. That to entitle the plaintiff to recover in this action, the jury must be satisfied from evidence that the use of the water by the defendant is an infringement of the plaintiff's rights under his deed.

·4. That plaintiff cannot recover in this action because he has not sufficient water to drive the wheels of his chopping-mill, inasmuch as the reservation in his deed does not embrace a chopping-mill, and the original owner having granted the use of all the water except what is specifically reserved in the deed from Benjamin Chambers to Peter Snyder.

WATTS, J., *inter alia*, charged as follows — "It appears in evidence that Upton Washabaugh purchased the property with a full knowledge of the nature and extent of the water privileges appurtenant thereto. The Washabaughs, father and son, continued the use of the water for chopping purposes, from the time of the notice in 1831 till the bringing of this suit. In April of the year 1850, the plaintiff, Jacob Oyster, became the owner of the first mill. *At this time the dam from which the grist-mill was supplied with water, was so constructed that the mouth of Washabaugh's race was in it,* and if you believe the evidence adduced on part of the plaintiff, the quantity of water drawn off by the defendant materially interfered with the running of the grist-mill. Some time after the purchase by Oyster, the dam was built above the mouth of Washabaugh's race. These facts are not disputed by the defendant; but he says, that having a right by grant to use the water for certain purposes specified, he had a right to make a change in the mode and objects of its use, if the quantity used is not increased by such change, and the change is not to the prejudice of the plaintiff. When B. Chambers sold to Snyder, he had in operation a merchant and a saw-mill upon this said stream, and in making the grant, he was careful to guard against any rival establishments being erected on the stream, close by his own, which might supplant his and destroy the value of his property. That this was his object, and the understanding of both parties, is clear from the grant.

"It is expressly mentioned that Snyder is to build no mill, nor use the water for any other purpose than those specified in the grant; Snyder was only to have the water after the mills below

[Washabaugh v. Oyster.]

were sufficiently supplied. To permit those who claim under Snyder, and by virtue of the grant to him, to use the water to turn a grist-mill, would be to make void the agreement and intention of the parties. This the law will not permit to be done. The defendant had no right to any portion of the water, until the mills below were fully supplied, and could not change the use of it from the purposes specified. *If, therefore, you believe that Upton Washabaugh used the water for the purpose of chopping or grinding grain, then it was in prejudice of the plaintiff's right, and he is entitled to your verdict."* To the opinion and charge the defendant excepted.

It was assigned for error: 1. The Court erred in admitting the agreement between David Washabaugh and Thomas Chambers, dated 6th of November, 1824. 2. In not answering the second, third, and fourth points put by the defendant's counsel. 3. In assuming in their charge to the jury that the defendant had diverted water from the plaintiff's mill, to the injury of the plaintiff, when it was a fact in dispute in the cause, and the weight of the evidence on this point was with the defendant. 4. In taking the case from the jury. 5. In their answer to defendant's first point. 6. In saying, "If therefore you believe that Upton Washabaugh used the water for the purpose of chopping or grinding grain, then it was in prejudice of the plaintiff's right, and he is entitled to your verdict." 7. In saying this was a *grist-mill* in their charge to the jury. 8. In saying that David Washabaugh had entered into a written agreement with Thomas Chambers, in which he admitted the right of Chambers to restrict him in the use of the water to the purposes specified in the original grant. 9. The charge of the Court was calculated to mislead the jury, by inducing them to believe there was but *one* point of defence, when there were others. 10. The Court erred in saying, "the dam of the plaintiff was so constructed that the mouth of the defendant's race was in it," there being no evidence of the fact.

*Cornyn* and *Reilly*, for Washabaugh, plaintiff in error.—It was contended that the water used did not belong to Oyster; it may belong to Culbertson, the owner of the *paper-mill*. Also, that the water, if it had belonged to the plaintiff, had escaped from his control, and its subsequent use did not injure the plaintiff.

The second point was not answered. The neglect to do so is ground of error.

The agreement between Chambers and David Washabaugh was merely to prevent the acquiescence of Chambers, from being a waiver of any rights he had, and was not admissible in evidence in this action. It was also contended that the defendant, in the use of the water, was not restricted to the purposes specified in the deed to Snyder; that in " a grant of a sufficient quantity of water to propel certain

[Washabaugh v. Oyster.]

specified machinery, the terms employed are used merely to indicate the *quantity* intended to be granted, and not to restrict it to the use of the machinery specified, and this on two grounds: first, it is more beneficial to the grantee; and secondly, that public policy demands an unrestrained application of the power in a manner most profitable to the owner, and thus most beneficial to the community: 3 *Comstock's N. Y. R.* 253, Cromwell v. Selden; 18 *Pick.* 268, Ashley v. Pease; 6 *N. Hamp. R.* 22, John v. Rand; 15 *Mass. R.* 313, Biglow v. Battel; 9 *N. Hamp. R.* 454. Public policy forbids a restriction in the use of water to any particular business: 1 *Vernon* 164; *Lewis on Perpetuities*, 27 *Law Library* 48–50; *Locke on Civil Gov. Ch.* 5; 2 *Bl. Com. Ch.* 1; 2 *Stephen's Nisi Prius* 1111–1114.

A chopping-mill is not within the restriction in the deed. It provides only against a grist, merchant, or paper-mill. Everything that is not *included* in the restriction, is *excluded* by law.

*Smith*, for defendant in error.—If any of the water used would have gone into the dam of the *paper-mill*, the defendant does not complain of that.

The water used was not an incident to the ground purchased by Snyder. When that lot was purchased, it had no race or running water on it, nor any building. The restriction in the use of the water was not a general restriction, but was limited to its use on the lot sold to Snyder. It was not illegal: 2 *Stephen's Nisi Prius* 1114.

The law implies damage in a case like this, without actual injury: 1 *Rawle* 27, and Alexander v. Kerr, therein cited.

The opinion of the Court was delivered, June 24, by

WOODWARD, J.—Our views of this case cannot be rendered intelligible without a statement, in proper connection, of the principal facts. It is an action for diverting and using plaintiff's water. Both parties claim under Benjamin Chambers, deceased. Benjamin Chambers owned a valuable grist-mill in the borough of Chambersburg, which was supplied with water from the "Falling Spring," a small stream running through the town, and emptying into the Conococheague creek, near to the mill of Mr. Chambers. He threw a dam across the Falling Spring, several rods above his mill, and conducted the water from the dam to his mill by means of a race or canal dug through the land. He owned the whole of the stream, and the ground on both sides of it, from its mouth to a point considerably above where he placed his dam.

At some period of time, not ascertained in the evidence sent up to us, a paper-mill was built on Falling Spring, between this dam and its mouth; and another dam was built across the stream, immediately at the paper-mill, to supply it with power. The paper-

[Washabaugh *v.* Oyster.]

mill dam backed the water and formed a pool quite up to the grist-mill dam; but of course could contain no water except such as escaped over the upper dam. And the water that did so escape could never serve the grist-mill, for the pool formed by the paper-mill dam was lower than the race that conducted the water to the grist-mill. Both these mills were situated on the south side of Falling Spring: the paper-mill immediately adjacent to the stream; the grist-mill a few rods off from the course of the stream. On the 15th May, 1790, Benjamin Chambers sold and conveyed to Peter Snyder a lot of ground on the north side of the stream, and several rods distant from it; and in the same deed granted him, his heirs and assigns, " the liberty and privilege of conveying from his spring, in a race, water to said lot . . . . . for the use of a boring and blade-mill, or tilting hammer, or oil or hemp-mill, but is only to use water for one wheel, to the best advantage, so as to use the least water that the seat will admit of; and said Snyder is to build no other mill, nor make no other use of the water than the mills mentioned." (See the full extract from said deed.) Snyder sunk a race from Falling Spring to his mill, the mouth of which was proved to be lower than that of Chambers', which supplied his grist-mill, and took the water not out of the grist-mill dam, but out of the paper-mill dam. But Snyder conveyed his mill and water-right to David Washabaugh, who changed the mill from the purposes mentioned in the deed, into a brewery and distillery, and a mill for chopping grain for them, and continued so to use it until the 6th November, 1824, when Thomas Chambers, who had then succeeded to the rights of Benjamin Chambers, gave him notice that he had no right to use the water for the purposes to which he was then applying it, but made him a lease of it for three years, renewable from year to year at pleasure, for " the chopping and grinding of his own grain, to the turning of carding and other machinery, and to a brewery."

On the 6th October, 1831, Thomas Chambers by a written notice determined this lease, but it would seem that Washabaugh continued the use of the water for the purposes of a brewery and distillery till his death, and when his property was about to be sold to his son, Upton Washabaugh, Jacob Oyster, who had become the owner of the Chambers mill, gave Upton notice that the water privilege as then used did not belong to the estate of David Washabaugh, but was an encroachment on his (Oyster's) water-rights. In disregard to this notice, Upton purchased and continued the use of the water for the brewery and distillery as before. He purchased in December, 1850, and this action was instituted to April Term, 1851.

On the trial there was evidence on the part of the plaintiff, that in 1850 a log lay across the stream where a foot bridge crosses it, and formed the dam for the grist-mill race, lower down than the

other dam before spoken of, and that in consequence of Washabaugh's use of the water the efficiency of the grist-mill was impaired. On the part of the defendant it was proved, that if the head-race of the mill was cleared out, the water would all pass down Oyster's race; that 1850 was a dry season; that Washabaugh's race is one foot lower than the lowest part of the dam, and that the water that escapes from the dam cannot be returned into Oyster's race; that the chopping stones of Washabaugh have been in his mill 45 years, and that the mill does not now take one-quarter as much water as when the other machinery was there. The jury also had a view of the premises.

The defendant insisted and asked the Court to charge in their 2d point, "that if the jury believe that the defendant uses the water only that escapes from the dam of the plaintiff, and which would not flow back into said dam, the plaintiff cannot recover."

The Court assumed that in 1850 the plaintiff's dam was so constructed that the mouth of Washabaugh's race was in it, and yet they also stated expressly to the jury, that some time after the purchase by Oyster in April, 1850, the dam was built *above the mouth of the Washabaugh race;* and having expressed the opinion that Washabaugh's right to use the water was limited to the purposes mentioned in the deed of 1790, they concluded by instructing the jury in these words: "If therefore you believe that Upton Washabaugh used the water for the purpose of chopping or grinding grain, then it was in prejudice of the plaintiff's right, and he is entitled to recover." These opinions of the Court below may have been sound on the case as it was presented to them, but as it is exhibited to us in a paper-book manifestly deficient in many points, we are not satisfied that they were correct.

Whose water is it that escapes from Oyster's dam? Culbertson owns the paper-mill, but how far up the creek do his rights extend? If the whole pool formed by his dam belongs to him, and if Washabaugh's race is so situated as to take the water from *that* pool, then it is very clear that the diversion is in prejudice of *his,* and not of *Oyster's* rights.

But whether Culbertson or Oyster is the owner of the water that escapes through or over Oyster's dam, must depend on the title deeds under which they respectively claim, no one of which is on our paper-books or has been exhibited to us.

But does Washabaugh's race take the water from the pool formed by Culbertson's dam, or from that formed by Oyster's dam? This is a question of fact, and a most important one in this case. The Court were clearly in error in withdrawing this question from the jury. It should have been distinctly submitted to them upon the evidence, and the plaintiff's 2d point should have been answered. If Washabaugh uses only the water that Oyster suffers to escape

[Washabaugh *v.* Oyster.]

and cannot reclaim, Oyster's remedy is to mend his dam instead of suing for a diversion. If this escaped water is the property of Culbertson, then to make Washabaugh liable to Oyster for using it, will make him pay for it twice, for, beyond a question, he would be liable to Culbertson. And in determining these questions, regard is to be had to the *place* of the grist-mill dam not only in 1850, but when Snyder and Culbertson bought, because a question may arise as to the legal right of Chambers or any one claiming under him to change the place of that dam, after rights in the water had vested in others.

It may turn out on an investigation of the facts more fully than they were gone into by the Court below, that though Oyster has no ground of complaint against Washabaugh for diverting his water, yet that having succeeded to all the interest of Benjamin Chambers, deceased, he has a right to enforce against Washabaugh the contract contained in the deed of 1790, and to prevent his carrying on any business on that lot, that should rival his own or impair the value of his property. By accepting that deed Snyder became bound, as by contract, which if he had *sealed* it, would have been his covenant, to use the lot and the water-right only for the purposes, and in the mode specified in the deed. Benjamin Chambers might undoubtedly have held Snyder and Washabaugh to that contract, for it ran with the land, and I do not agree with the counsel of the defendant in error, that there is any rule or principle of public policy which would compel Chambers to submit, against the contract of the party, to the introduction of a brewery or distillery into his immediate neighborhood, and upon a lot sold for purposes specifically different and far more beneficial to the public.

But then his most obvious remedy would have been on the contract and not for a tort. And especially so if he had parted with the dominion of the water that escaped his dam, and if it was *this* water that Snyder and Washabaugh used. There is evidence in the agreement of 1824, that Thomas Chambers had succeeded to all the rights of Benjamin Chambers, but where is the evidence that Oyster has? The Court indeed say that these parties litigant stand in the same relation to the case, as if the action were between the original parties to the deed, but there is not only no evidence of it on our paper-books, but it is apparent that the rights of Culbertson have intervened, and that they must influence materially the relations which the present parties sustain to the subject-matter of this controversy.

Until more fully informed of the facts which must affect the rights of the three, Oyster, Culbertson, and Washabaugh, to this water, we withhold an opinion on the precise question ruled by the Court below. Assuming what they assumed to be the case, we will not say that they were in error in deciding that Washabaugh's

·[Washabaugh *v.* Oyster.]

application of the water to other purposes than those of the deed to Snyder, was a diversion of it for which an action would lie. Though not perhaps the most obvious remedy of Oyster, such an action may be a possible remedy. But the difficulty in our way in laying down the law of the case at this time is, that we see no evidence in the record of some things assumed by the Court below. We do see contradictory evidence of other things which ought to have gone to the jury, and there are several matters indicated in what I have said, which it is necessary should be investigated, that do not seem to have been inquired of on the former trial.

As the cause must go. back for another trial, it is proper for us to say that the Court were right in admitting the agreement of 6th November, 1824, in evidence.

Judgment reversed and a *venire de novo* awarded.